The INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION 1395, and Sixteen Individual Retirees, Appellants–Complainants,

v.

INDIANAPOLIS POWER & LIGHT COMPANY, Appellee–Respondent.

No. 93A02–0906–EX–498.

Court of Appeals of Indiana.

Jan. 29, 2010.

Rehearing Denied April 9, 2010.

John F. Wickes, Jr., Thomas R. Ruge, Todd A. Richardson, Joseph P. Rompala, Lewis & Kappes, Geoffrey S. Lohman, Fillenwarth, Dennerline, Groth & Towe, Indianapolis, IN, Attorneys for Appellants.

Peter J. Rusthoven, Teresa E. Morton, Barnes & Thornburg LLP, Indianapolis, IN, Attorneys for Appellee.

1. We held oral argument in this case at the Statehouse on November 30, 2009. We thank counsel for their time and commend them on the quality of their advocacy.

2. This accounting change is reflected in Statement of Financial Accounting Standard 106, which both parties refer to as "SFAS 106."

## OPINION

MAY, Judge.

In a 1995 settlement Indianapolis Power and Light (IPL) obtained a rate increase, part of which would fund a trust for non-pension retiree benefits. IPL continued to fund the trust for six years. When IPL was acquired by a holding company, it curtailed its funding of the trust and cut employee benefits, but it continued charging its customers pursuant to the rate increase settlement. The Indiana Utility Regulatory Commission ("the Commission") decided the terms of the settlement did not require continued funding, and on appeal, the International Brotherhood of Electrical Workers and some of the IPL retirees (collectively, "IBEW") dispute the effect of the language in the settlement. We affirm.[1]

## FACTS AND PROCEDURAL HISTORY

In 1995, IPL sought a rate increase to recover about $290 million from ratepayers to cover the cost of certain non-pension retiree benefits. IPL expected the cost of these benefits would increase because in 1992, the Commission issued an order allowing regulated utilities to adopt a different accounting standard, the "accrual method,"[2] in accounting for their non-pension retiree benefits. The change in accounting method was adopted in 1992, but the Commission deferred decisions on the ratemaking treatment of those costs until each utility's next general ratemaking proceeding. For IPL, that was 1995.

Before SFAS 106, non-pension retiree benefits, such as life and health insurance, were accounted for on a cash basis—i.e., employers reported those costs in the year when they were paid. Under the accrual method, costs are reported during the year when the benefits are earned, even if not yet paid.

In the proceedings leading up to the 1995 settlement, IPL proposed to establish and fund a Voluntary Employees' Beneficiary Association trust (the "VEBA trust") to pay for the benefits. IPL asked that the cost of the VEBA benefits be computed based on the SFAS 106 "accrual" method, and in the settlement agreement the Commission said "SFAS 106 costs shall be treated as proposed by IPL." (App. at 40.) In its rate order adopting the agreement the Commission approved "the treatment of non-pension post-retirement benefit costs in accordance with [SFAS 106]." (*Id.* at 50.)

IPL funded the trust for six years, but then stopped the funding when it was acquired by a holding company. Nevertheless, it continued to collect the increased rates provided by the settlement.

In November 2007, IBEW brought a complaint before the Commission to enforce the 1995 order and settlement agreement. IBEW wanted the Commission to order IPL to resume its contributions to the VEBA trust and to make a sufficient contribution to the trust so it would be in the financial position in which it would have been had IPL not stopped making payments. IBEW and IPL both moved for summary judgment.

The Commission granted IPL's motion. It interpreted the wording in the settlement "SFAS 106 costs shall be treated as proposed by IPL," (*id.* at 9), to relate only to "the accounting treatment of those costs," and noted it had "made no specific finding related to the actual dollar numbers associated with that accounting treatment." (*Id.* at 11.) As the agreement did not specify any rate adjustment for SFAS 106 costs, the Commission determined it did not require "some set amount of funding for post retirement benefits," and therefore did not require "ongoing funding of the VEBA trust." (*Id.*)

## DISCUSSION AND DECISION

### 1. *Standard of Review*

■ Our Supreme Court recently explained in *N. Ind. Pub. Serv. Co. v. United States Steel Corp.,* 907 N.E.2d 1012 (Ind. 2009) ("*NIPSCO* ") the standard of review to apply when the Commission enters a summary judgment order interpreting a settlement agreement. NIPSCO argued its appeal was not the product of a regulatory settlement but rather a dispute between two private parties over contract interpretation, which would be a question of law appropriate for *de novo* review. NIPSCO asserted the Commission made no use of ratemaking principles or agency expertise, so it deserved no deference on the question of contract interpretation.

The Court found "this paints too simple a picture of the processes under which the Contract became a Commission order":

Regulatory settlements bear important differences from agreements governed purely by the law of contracts. Such an agreement does not become effective until and unless the Commission acts on the agreement. A contract between private parties takes on public interest ramifications once the Commission approves it. The Commission maintains the authority and statutory responsibility to supervise and regulate the Contract.

\*  \*  \*  \*  \*  \*

As it commonly does in hearing the disputes before it, the Commission did more than find facts; it deployed its expertise in the subject matter, one source of judicial deference to the Commission's decision-making. Here, the Commission approved the contract when the parties entered it, effectively making it an order of the Commission. This means the Commission interpreted its

own order, not a contract entered by the parties and later disputed.

\*    \*    \*    \*    \*    \*

Appellate courts apply a *de novo* standard when reviewing a trial court's summary judgment order because the reviewing court faces the same issues that were before the trial court and analyzes them the same way. By contrast, review of an agency order does not involve the same analysis on appeal. As Justice Arterburn wrote, "ratemaking is a legislative, not a judicial function...." Agencies are not judicial bodies. They are executive branch institutions which the General Assembly has empowered with delegated duties. As such, an adjudication by an agency deserves a higher level of deference than a summary judgment order by a trial court falling squarely within the judicial branch. We therefore apply the established standard of review for judicial review of Commission orders ... basic facts are reviewed for substantial evidence, legal propositions are reviewed for their correctness. Ultimate facts or "mixed questions" are evaluated for reasonableness, with the amount of deference depending on whether the issue falls within the Commission's expertise.

In this case, interpreting the Commission's order is a question falling well within the Commission's expertise. NIPSCO acknowledges the 1999 order itself involved the Commission's special competence, and interpreting the meaning of the order is not substantively different than approving the Contract. We therefore consider this question as a mixed question of law and fact with a high level of deference, examining the logic of the inferences made and the correctness of legal propositions without replacing our own judgment for that of the Commission.

*Id.* at 1017–18 (citations omitted).

IBEW acknowledges the NIPSCO analysis, but distinguishes it and invites us to apply the typical summary judgment standard. It asserts "the disputed provision in NIPSCO ... called for technical understanding of the distinction between demand charges and energy charges in a two-part electric rate," while the provision before us calls only for interpretation of the phrase "as proposed by IPL." (Br. of Appellants at 19.)

■ Insofar as an order involves a subject within the Commission's special competence, we should give it greater deference; if the subject is outside the Commission's expertise, we give it less deference. *NIPSCO*, 907 N.E.2d at 1017. We cannot say the Commission's treatment of the VEBA costs is so far outside its ratemaking expertise that we need not give it the level of deference required by the *NIPSCO* Court. In *NIPSCO*, our Supreme Court described the agreement:

Article 5 of the Contract outlines the rates NIPSCO is to charge U.S. Steel. Article 5.1 provides that "This Contract is a requirements contract for firm service with no minimums or take-or-pay conditions.... [E]ffective October 1, 2005 through the end of the Contract term; a market based price adjustment factor will be used to adjust the kilowatt-hour prices set forth in Article 5.2...." (App. at 32.) Article 5.2 sets forth the bifurcated rate structure including a Demand Charge and an Energy Charge. (App. at 33.) The Demand Charge language refers to "all kilowatts of billing demand," while the Energy Charge language refers to "kilowatt-hour[s]." (App. at 33.) The Commission found that the language of the Con-

tract unambiguously supported U.S. Steel's interpretation that the Adjustment applied only to the Energy Charge, that the definitive Contract superseded any earlier expressions of intent, and that the Term Sheet did not make the Contract ambiguous or demonstrate a contrary intent. (App. at 13–17.) In reaching these conclusions, the Commission *applied utility and contract law* consistent with established principles.

907 N.E.2d at 1018–19 (emphasis added).

Similarly, in the case before us, the Commission "applied utility and contract law" in its interpretation of its own ratemaking order. In *Boone County Rural Elec. Membership Corp. v. Pub. Serv. Comm'n,* 239 Ind. 525, 159 N.E.2d 121 (1959), Boone County challenged the Commission's treatment of accruals for deferring federal income tax. Our Supreme Court noted:

> The right and power of the Commission to authorize an accounting system under which reserves are set up for future tax increases, losses or contingencies is an administrative matter and, so long as such procedure is within reason and prudence, the trial court has no right to interfere. The Commission is fully authorized by statute to determine the accounting system and procedure to be followed. This includes specifically reserves for, and rates of depreciation, and the use of such reserves.

*Id.* at 536, 159 N.E.2d at 126. Because the Commission is "fully authorized by statute to determine the accounting system and procedure to be followed," we must give deference to its decision as to the accounting treatment of the SFAS 106 costs and the ratemaking implications of that treatment.

2. *Does "SFAS 106 costs shall be treated as proposed by IPL" require continued VEBA Trust Funding?*

■ The Commission determined the language "SFAS 106 costs shall be treated as proposed by IPL," (App. at 40), "re-

ferred only to the accounting treatment of the SFAS 106 costs," (*id.* at 7), so it did not address the VEBA trust or require further funding. We cannot find unreasonable the Commission's interpretation of its own order.

"SFAS 106" refers to Statement of Financial Accounting Standard 106, and therefore references only the accounting treatment of certain costs. The sentence "SFAS 106 costs shall be treated as proposed by IPL" appears in a section of the agreement called "Other Accounting Matters." (*Id.* at 40.) The rate order that incorporated the settlement agreement noted the Commission "approves the treatment of non-pension post-retirement benefit costs in accordance with [SFAS 106]." (*Id.* at 50.)

The context for this aspect of the 1995 Settlement agreement also permits the Commission's interpretation. In 1992, the Commission issued an order allowing regulated utilities to adopt the accrual method as the accounting standard for their non-pension retiree benefits, but it deferred decisions on the ratemaking treatment of those costs until each utility's next general ratemaking proceeding. For IPL, that was the 1995 proceeding, and that was when the Commission would decide whether to permit IPL to treat its SFAS 106 costs on an accrual basis.

We accordingly cannot say the Commission was unreasonable to find the phrase "as proposed by IPL" referred only to accounting methods for SFAS 106 costs and did not require continued funding of the VEBA trust. We therefore must affirm the Commission's Order.[3]

Affirmed.

BAKER, C.J., and BROWN, J., concur.

**3.** While the highly deferential standard of review requires this result, we do not condone the actions of IPL and its parent company in this proceeding. IPL described VEBA funding as one of the components of its rate case proposal regarding retiree benefit costs. It presented schedules showing twenty years of projected contributions, which schedules corresponded to "the rate inclusion … sought by IPL in the rate case to cover non-pension retiree benefit costs." (Br. of Appellants at 25.) IPL told the Commission VEBA funding would proceed "at the time and to the extent it is recognized in rates," (App. at 252), and said "[t]he best course of action is to fund this liability, but that is only possible if cash is provided through recognition of the SFAS 106 accrual for ratemaking purposes." (*Id.* at 289.) In other words, it appears IPL obtained a substantial rate increase based in large part on its promises to continue funding the VEBA trust for its retirees' benefit. Between 1995 and 2000, IPL's contributions ranged from about $12 million to about $19 million, which IBEW characterizes as "commensurate with the representations made by IPL in the rate case." (Br. of Appellants at 27.) This indicates IPL understood the additional rate revenue was to be contributed to the VEBA trust. In addition, the record is replete with references to IPL's promises to its employees that it would not eliminate the benefits in the future. (*See, e.g.,* App. at 359) (testimony by IPL witness that the benefits could be removed by IPL only if "it were to go back on a solemn promise to its employees").